## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD A. ROSEN, | : | CIVIL ACTION NO. |
| On Behalf of the Ferguson Enterprises, Inc. | : | |
| 401(k) Retirement Savings Plan and On Behalf | : | |
| of All Other Similarly Situated Employee | : | |
| Benefit Plans, | : | CLASS ACTION COMPLAINT |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | JURY TRIAL DEMANDED |
| PRUDENTIAL RETIREMENT INSURANCE | : | |
| AND ANNUITY COMPANY, PRUDENTIAL | : | |
| BANK & TRUST, FSB, and PRUDENTIAL | : | |
| INVESTMENT MANAGEMENT | : | |
| SERVICES, LLC, | : | |
| | : | |
| Defendants. | : | |

Plaintiff, Richard A. Rosen ("Plaintiff"), by and through his undersigned counsel, in

support of this Complaint, hereby pleads and avers as follows:

## I.  INTRODUCTION

1.     Personal savings accounts in the form of 401(k) and other defined contribution

plans have become the primary method for employees in the United States to save for retirement

in recent years.  The importance of defined contribution plans to the United States retirement

system has become increasingly pronounced as employer-provided defined benefit ("DB") plans

have become increasingly rare as an offered and meaningful employee benefit.

2.     Prudential (defined below) acts as the "service provider" and a fiduciary for

thousands of 401(k) retirement plans in the United States

3.     Prudential has entered into revenue sharing agreements and similar arrangements

("revenue sharing contracts" or "participation agreements") with various mutual funds, affiliates

of mutual funds, mutual fund advisors, sub-advisors, investment funds, including collective trusts, and other investment advisors, instruments or vehicles (collectively, "mutual funds"), pursuant to which Prudential receives revenue sharing payments (which amount to kickbacks) for its own benefit from these mutual funds in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, *et seq.* (*i.e.*, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

4.      The kickback payments at issue are essentially part of a pay-to-play scheme in which Prudential receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees (the "revenue sharing payments") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

5.      Prudential uses its ownership and control over separate accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are deducted directly from the assets of the separate accounts.  Prudential has acknowledged its fiduciary status under ERISA by virtue of its ownership and control of these separate accounts.

6.      The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by Prudential and/or based on the magnitude of the investments by such retirement plans in the mutual fund.

7.      While the revenue sharing payments are often internally described by service providers, such as Prudential, as "services fees" and reimbursement for expenses incurred in providing services for, to, or on behalf of the mutual funds, and deceptively characterized as such to retirement plans and their participants (thereby concealing their true nature), the amounts of the revenue sharing payments bear absolutely no relationship to the cost or value of any such services. Indeed, Prudential performs the same services regardless of the amount of revenue sharing payments, if any, made to it. As a result of its acceptance of these unlawful payments, Prudential occupies a conflicted position whereby it effectively operates a system in which it is motivated to increase the amount of such payments, while improperly requiring certain plans and/or participants who invest in mutual funds and similar investments that provide higher amounts of revenue sharing payments to incur and pay unreasonably high fees for the services provided.

8.      The services provided by Prudential that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that Prudential has historically provided to its retirement plan customers as a necessary part of its business in return for fees directly collected by it from such customers, and these fees generally did not change as a result of Prudential's receipt of the revenue sharing kickbacks from the mutual funds and were not reduced in a manner that corresponds with the amount of revenue sharing kickbacks received.

9.      Prudential's receipt of the revenue sharing payments at issue violates ERISA's prohibited transaction and fiduciary duty rules and should not be countenanced since the receipt

of such payments places Prudential in a conflicted position in which the interests of its retirement plan customers can be and are sacrificed in the interest of Prudential earning greater profits through the receipt of revenue sharing payments.

10.     As explained below, Prudential also has engaged in acts of self-dealing with respect to the retirement assets of the Plans (defined below) and the Class (defined below) held in the Separate Accounts (defined below) and with respect to certain proprietary and/or sub-advised mutual funds and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as ERISA's fiduciary rules.

11.     This is an action for equitable relief and damages under ERISA in which Plaintiff seeks to recover, for the benefit of the 401(k) plans in the Class and all other similarly situated retirement plans and entities (collectively, the "Plans"), also known as employee pension benefit plans under ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) that are subject to Internal Revenue Code Sections 401(a) and 401(k), the revenue sharing payments and other compensation that Prudential has improperly received.

12.     Plaintiff brings this action on behalf of the Plan and on behalf of all other similarly situated Plans under ERISA §§ 409(a) and 502(a) and (g), 29 U.S.C. §§ 1109(a) and 1132(a) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendant described herein violate ERISA and applicable law;

- A permanent injunction against Defendant prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments and other compensation improperly received by Prudential, or, alternatively,

the profits earned by Prudential in connection with its receipt of such revenue sharing payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II. **THE PARTIES**

13. Plaintiff is a former participant of the Ferguson Enterprises, Inc. 401(k) Retirement Savings Plan f/k/a Wolseley North America 401(k) Plan ( the "Ferguson Plan" or the "Plan"). At all pertinent times, as discussed more fully below, Prudential acted as a service provider for and a fiduciary of the Plan, as well as all of the Plans. Plaintiff brings this action in a representative capacity on behalf of the Plan and all other similarly situated Plans (collectively, the "Plans"). Plaintiff is a resident of Oak Park, Ventura County, California.

14. Defendant, Prudential Retirement Insurance and Annuity Company ("PRIAC"), is an insurance company with its principal place of business in Hartford, Connecticut. PRIAC is self-described as a "Prudential Financial" company, with Prudential Financial being a service mark of The Prudential Insurance Company of America and its affiliates. "Prudential Retirement" is self-described as a "Prudential Financial" business unit. Prudential Retirement's group annuity contracts and/or group funding agreements (discussed more fully below and defined as the "Group Contracts") are issued by PRIAC. PRIAC also issues insurance and/or investment products known as "institutional sub-advised funds," which are offered as investment options to the Plans. PRIAC is a fiduciary to the Plans within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A).

15.     Defendant, Prudential Bank & Trust, FSB ("Prudential Trust"), also is a Prudential Financial company and serves as the Trustee to the Plan, as well as many, if not all, of the Plans.  As a technical matter, Prudential Trust acts as the "contractholder" of the Group Contracts (defined below) for the Plans in its capacity as the Trustee for the Plans.  As a result, under the terms of the Contract, Prudential Trust has the authority, control and discretion to add, delete or substitute the investment options available to the Plans, as well as to make investment decisions on behalf of the Plans and to allocate any revenue sharing payments received by Prudential Trust.  Prudential Trust also maintains its principal place of business in Hartford, Connecticut at the same address as PRIAC.  Prudential Trust is a fiduciary to the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

16.     Defendant, Prudential Investment Management Services, LLC ("PIMS"), also is a Prudential Financial company that acts as an investment adviser to the Plans and offers certain of the mutual fund shares and other investment vehicles provided as investment options to the Plans.  PIMS maintains its principal place of business and headquarters in Newark, New Jersey but also maintain substantial operations in Hartford, Connecticut, in connection with Prudential's retirement business (*i.e.*, "Prudential Retirement").  PIMS also acts as a "sub-advisor" with respect to certain Prudential Retirement mutual funds and other investment vehicles.  PIMS is a fiduciary to the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

17.     PRIAC, Prudential Trust and PIMS act as an integrated enterprise, as alter egos of each other and/or as a single/joint employer.  Unless otherwise noted, PRIAC, Prudential Trust

and PIMS are referred to collectively hereafter as "Prudential" or "Prudential Retirement" or "Prudential Financial" or "Defendant." Prudential is a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### III. JURISDICTION AND VENUE

18. Plaintiff seeks relief on behalf of the Ferguson Plan and all other similarly situated Plans pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

19. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

20. Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Prudential maintains its headquarters and principal place of business in Hartford, Connecticut.

21. At all pertinent times, Prudential has conducted its retirement business and the retirement business of all other Prudential affiliates and entities from its offices in this judicial district in Hartford, Connecticut, which functions as the nerve center for the retirement operations of Prudential, which is known and sometimes referred to as "Prudential Retirement."

### IV. BACKGROUND FACTS

#### A. The Services That Prudential Provides To The Plans

22. At all pertinent times, Prudential Retirement has held itself out and continues to hold itself out to Plaintiff, the Plans and the Class as providing a full array of services, and

represents that Prudential can help design and maintain a long-term retirement strategy for a company and its employees.

23.     As Prudential explains on its website with respect to retirement services in general:

> Providing Innovative Retirement Solutions for more than 85 Years
>
> A Rock Solid® provider with $1.176 trillion in assets under management, Prudential Financial has provided clients with financial solutions since 1875.
>
> An insurance leader for more than 135 years, Prudential Financial offers innovative ways to manage risk and provide guaranteed retirement income.
>
> An integral part of that tradition for the past 88 years, Prudential Retirement delivers retirement plan solutions for public, private, and nonprofit organizations. Our services include state-of-the-art recordkeeping, administrative services, investment and risk management, comprehensive employee communications, and trustee services.

http://www.retire.prudential.com/view/page/rs/16962.  Prudential Retirement has more than 5,000 clients, services more than 3.5 million participants and administers over $360 billion of assets.  As Prudential consistently assures its retirement customers, "[w]hen it comes to your financial health, remember: Prudential Retirement® can help you plan for a more financially secure future."

24.     Similarly, with respect to the services it provides to defined contribution plans, including 401(k) plans, Prudential describes its services as follows:

> We have taken what we do best—balancing growth and protection—and applied our depth of experience to transform how our nation saves for retirement via employer-sponsored plans. Our

philosophy focuses on four key disciplines that, when used
together, result in a powerful combination:

> Smart plan design
> Streamlined processing
> Investments and guaranteed income
> Lifelong education

http://www.retire.prudential.com/view/page/rs/16959.

25.     As described above, Prudential's retirement services are provided from a

corporate perspective by PRIAC, Prudential Trust and PIMS, all of which act in concert with

each other.

26.     The Plans' assets that are held in the Separate Accounts (defined below) are

included in the over $250 billion in Separate Account assets that Prudential has under

management, which are included in the over $700 billion in assets on Prudential's balance sheet.

Ironically, although Prudential markets use of its Separate Accounts as a manner, means and way

to avoid the effects of revenue sharing payments, including the prospect that certain Plans and

their participants are forced to shoulder excessive fees as a result of the revenue sharing

payments associated with their investments, Prudential has no actual process or policy in place to

effectively avoid the pernicious effect of such unlawful payments, despite its obligation as a

fiduciary to do so.  Specifically, in its own publications trumpeting its Separate Accounts,

Prudential observes that "[t]he allocation of revenue sharing among participant accounts is

emerging as a fiduciary issue for participant-directed defined contribution plans, such as 401(k)

plans" and that "'the method of allocation is a fiduciary function that is governed by ERISA's

general fiduciary duty and prohibited transaction rules...,'" while asserting that "Insurance

Company Separate Accounts provide an opportunity to reduce this disparity by either 'levelizing' revenue sharing across all participants, or eliminating revenue sharing altogether and charging a separate flat administrative fee." http://research. prudential.com/documents/rp/ Insurance_Company_Separate_Accounts.pdf, *quoting Fiduciary Issues Related to the Allocation of Revenue Sharing* by Fred Reish and Bruce Ashton (July, 2011). But despite that acknowledgment and assertion, as well as Prudential's acknowledged status as a fiduciary with respect to the Separate Accounts, Prudential's Separate Accounts for the Plans neither levelize revenue sharing across all participants or eliminate revenue sharing altogether by simply charging a direct, separate, flat administrative fee that is identifiable and transparent in nature. Thus, Prudential's representations regarding its Separate Accounts are both false and misleading in nature.

27.     Prudential is considered a leader in providing services to the employer retirement markets, which markets include retirement plans such as the Plan. Prudential markets itself as providing Plans, such as the Ferguson Plan, with the full range of services sufficient to offer retirement benefits to its employees.

28.     One of Prudential's most profitable lines of business is providing services associated with retirement and benefit plans. Prudential has thousands of 401(k) plan customers and ranks in the top five of all 401(k) providers in the United States based upon assets under management.

29.     The retirement plan services Prudential provides include recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing

participants, loan processing and administrations, asset transfers, IRS tax withholding and

reporting, provision of benefits illustrations, processing and distribution of benefits and

withdrawals, and administration of communications with participants.

**B.    The Agreements Between The Plans And Prudential And The Retirement
        Investments Provided Under Those Agreements**

30.    Pursuant to the terms of Group Annuity Contracts or Group Funding Agreements

(the "Contracts" or "Group Contracts"), Prudential represents that it manages the retirement plan

assets of the Plans.  Prudential enters into such standard form Group Contracts with virtually all

of the Plans.

31.    Pursuant to the Group Contracts or similar group funding agreements, Prudential

has provided (and provides) investment options to the Ferguson Plan and other similarly situated

Plans, through insurance products called group variable annuities or through similar insurance

arrangements/vehicles.

32.    After entering into one of the Group Contracts with the Plans, the Group Contract

typically is assigned by the given retirement plan to Prudential Trust, which then collects each of

the Plans' retirement contributions in a collective trust and then invests them in insurance

company separate accounts established, managed and controlled by PRIAC.

33.    Pursuant to the terms of the Group Contracts, the Plans' retirement assets are

invested in one of two general options: (a) a Prudential Stable Value fund or other fixed account

(collectively, the "Fixed Account") in which Prudential (i) takes custody and control of the

Plans' retirement assets and places them in its general account (as a fiduciary under applicable

law because, *inter alia*, Prudential takes ownership of these retirement assets and makes all

investment decisions with respect to those assets while determining its own fee), (ii) commingles those retirement assets with Prudential's other assets in its general account (while subjecting those retirement assets to the risks undertaken by Prudential in conducting its business enterprise and subjecting those retirement assets to claims by the general creditors of Prudential), (iii) establishes a crediting rate that can be as low as zero and which Prudential, at its own discretion, establishes on a semi-annual basis, and (iv) sets its own rate of compensation by earning the spread between the return achieved on Prudential's own investment of these retirement assets and the rate of return established by Prudential (which Prudential retains the right to adjust in its own discretion), while retaining the discretion and ability to reduce the rate of return to zero, based upon Prudential's own interests, including its profitability; and (b) Separate Accounts created by Prudential for the purpose of investing in mutual funds, which (i) Prudential owns along with all of the retirement assets contained in those accounts (and for which Prudential indisputably functions as a fiduciary under applicable law), (ii) are created under and pursuant to Connecticut law or other state laws, (iii) are not charged with the liabilities of Prudential to the extent of the reserves and anticipated contract liabilities of those accounts, but otherwise are subject to the claims of creditors of Prudential, (iv) buy and hold the shares of the mutual funds in which the Plans' participants choose to invest, and (v) are utilized by Prudential as the tool to negotiate revenue sharing or participation agreements with the mutual funds so that Prudential can earn additional compensation that bears no relationship to the services that it provides to the Plans and/or the mutual funds.

34.     Plans and their participants do not invest directly in the mutual funds, but invest

in "variable accounts," including the "Separate Accounts," as well as the "Fixed Account" discussed above, all of which are established by Prudential and are invested by and through collective trusts established and administered by Prudential Trust, which creates another layer of fees for Prudential beyond and in addition to Separate Account fees charged by PRIAC.

35.     The Separate Accounts are established, administered, owned and managed by Prudential (*i.e.*, PRIAC) and the Separate Accounts' assets are segregated from the general assets of Prudential.

36.     The Separate Accounts are part of an investment vehicle known as a group variable annuity offered by Prudential.  A group variable annuity is an insurance contract that provides for both general account (*i.e.,* the Fixed Account) and "Separate Account" investments. These types of investment vehicles are used to fund qualified retirement plans, like 401(k), profit-sharing, and other types of company-sponsored retirement plans.  The Separate Accounts permit Prudential to pool the investments of the Plans before collectively investing them in mutual funds and similar investment vehicles.  The assets of each Separate Account are segregated (or separate) from all of the other assets of Prudential but, as explained above, are not entirely immune from the claims of creditors of Prudential.  The Separate Accounts purchase and own selected mutual funds or other funds/investment vehicles that mimic the performance of these mutual funds.

37.     The Separate Accounts maintained by Prudential correspond to and/or are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Group Contracts that Prudential maintains with the Plans.

38.     The Separate Accounts (or their sub-accounts) are divided into accumulation units (sometimes referred to as "record units") that track the performance of shares of a selected mutual fund investment with the price per accumulation unit calculated by dividing the total value of the assets of the Separate Account by the number of units in the Separate Account.

39.     Pursuant to the Group Contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Prudential allocates those contributions to particular Separate Accounts or sub-accounts within the Separate Accounts that correspond to the chosen mutual funds.  In return for the contributions, which are assets of these ERISA-qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the separate accounts, which accumulation units, like the Separate Accounts themselves and the sub-accounts, are held and owned by Prudential.

40.     Prudential maintains discretion, authority and control over the Separate Accounts, the sub-accounts and the accumulation units.

41.     The accumulation units of the Plans and their participants, which are held by Prudential, like the Separate Accounts and sub-accounts, constitute assets of the Plans.

42.     Based on the combined contributions to the sub-accounts made by all of these Plans and their participants, Prudential sells and purchases mutual fund shares to hold in the Separate Accounts (and receives revenue sharing kickbacks in return for these purchases).

43.     The value of a one of the Plans' accumulation units (shares) in the Separate Account fluctuates based upon the value of the mutual fund shares held within the various

sub-accounts.

44.     Pursuant to the Group Contracts administered and managed by Prudential and issued in the names Prudential, Prudential manages the retirement assets of the Plans in the Separate Accounts and serves as legal title owner and holder of the assets in the Separate Accounts. The investments of the Ferguson Plan and all of the other Plans are held in Separate Accounts in the name of Prudential, which are administered and managed by Prudential as well.

45.     Prudential exercises discretionary authority and control with respect to the Plans' assets held in the Separate Accounts by, among other things, electing to receive dividends from the mutual funds into the Separate Accounts in the form of additional mutual funds shares and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of the same mutual funds.

46.     Under the terms of its own Group Contracts, and in recognition of its fiduciary status, Prudential holds the Plans' assets in Separate Accounts under and in Prudential's own name, places those assets in short-term investments as it sees fit (*i.e.*, in its discretion), and may set off certain amounts of the funds held in those Separate Accounts, based on its own unilateral determinations with respect to the non-payment of fees and other factors, before ultimately transferring the Plans' assets to mutual funds in return for which it is paid kickbacks in the form of revenue sharing payments.

47.     Prudential also influences its own compensation by effectively electing to receive all dividends payable to the Plans from mutual funds in the form of additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Separate Accounts and

under Prudential's management and, thus, increasing the amount of revenue sharing kickbacks payable to Prudential.

48. As the owner of the Separate Accounts (*i.e.*, PRIAC) and the trustee of the collective trusts through which the Plans' retirement funds are invested in the Separate Accounts (*i.e.*, Prudential Trust), Prudential retains the discretion, authority and control to vote the interests of the mutual fund shares held in the Separate Accounts, as well as to engage in securities lending activities with third parties pursuant to which it earns compensation on its own account in connection with transactions involving the assets of the Plans.

49. Prudential exercises discretion, authority and control with respect to the Plans' assets and acts as a fiduciary by managing the Plans' investments in the Fixed Account and placing those assets of the Plans in the general account(s) of Prudential. Prudential determines its own compensation with respect to the Fixed Account investments and has breached its fiduciary duty to the Plans by extracting excessive compensation in connection with its investments in the Fixed Account.

50. Prudential also places the Plans' investments in a "suspense account" or the equivalent thereof when awaiting further or clarifying investment instructions from the Plans' participants, acts as a fiduciary with respect to such temporary accounts and, even during this holding period, Prudential earns, without justification, impermissible revenue sharing payment kickbacks and other fees from its suspense account investments.

51. Prudential indisputably holds, owns, administers, manages and controls the Separate Accounts, as well as their sub-accounts, and uses the Separate Accounts as a delivery

mechanism to purchase and sell shares in the mutual funds.

52.      In direct return for delivering these funds from the Separate Accounts to the
mutual funds, Prudential receives the revenue sharing kickbacks at issue pursuant to the scheme
detailed herein.

53.      Prudential owns and manages the Separate Accounts and maintains and exercises
discretion and control with respect to the retirement assets in the Separate Accounts.  Prudential
is able to influence and control its own compensation derived from the Separate Accounts by,
among other things, negotiating the terms of the participation agreements with the mutual funds,
which generally make revenue sharing payments on the basis of the assets invested by the
Separate Accounts in their mutual funds.  As detailed in the Group Contracts and its Trust
Agreements with the Plans, Prudential maintains complete discretion to substitute, eliminate and
add funds within its Separate Accounts, as well as to make other investment decisions.
Prudential also reserves the right to transfer assets of the Plans between Separate Accounts and
to make changes within the Separate Accounts, including (a) creating new divisions of the
Separate Accounts, (b) creating new Separate Accounts and new segments or divisions of those
accounts, (c) combining any two or more segments or divisions of Separate Accounts, (d)
making available additional or alternative divisions of the Separate Accounts investing in
additional investment companies, (e) investing the assets of the Separate Accounts in securities
other than shares of the funds, (f) operating the Separate Accounts as a management investment
company under the 1940 Act or withdraw such registration if no longer required, (g) substituting
one or more funds for other funds with similar investment objectives or otherwise, (h) deleting

funds or closing funds to future investments, and (i) changing the name and investment objectives of the Separate Accounts.

54.     Prudential also controls the menu of available mutual funds offered in its Separate Accounts and retains the discretion to change its fund menus and to not offer certain investment options to Plans based upon contract pricing and other considerations.

55.     Under the Group Contracts, Prudential also retains and exercises the discretion and control to self-determine its own compensation under the Separate Accounts by (a) calculating the current value of the Separate Accounts by applying a "daily asset charge," which Prudential calculates itself based on so-called "expense risks" and which can, in Prudential's discretion, include a profit payable to Prudential, and (b) applying so-called "experience credits" to reduce or increase the fees charged to the Separate Accounts, based upon Prudential's unilateral determination.  Prudential uses its ownership of and control over the Separate Accounts and their assets, as well as this discretion and control which it exercises, to, among other things, negotiate for the receipt of revenue sharing payments from mutual funds.

56.     Prudential also utilizes the assets contained in the Separate Accounts, all of which appear on its balance sheet, to earn additional compensation independent of the revenue sharing payments by utilizing uncommitted assets in these Separate Accounts to engage in certain hedging transactions, securities lending transactions and to negotiate for the payment of additional compensation from third parties on the basis of its ownership and control of these retirement assets.  Thus, Prudential utilizes its ownership and authority over the Separate Accounts, as well as the discretion and control that it exercises over the Separate Accounts, to

obtain additional compensation from third parties that it effectively determines, in its own

discretion, by essentially investing the retirement assets of its customers through schemes and by

utilizing devices independent and apart from the investment of these assets in mutual funds and

other contemplated investments. Prudential also requires that all Plans offer the Fixed Account

option to their participants. Prudential imposes this contractual requirement because, regardless

of the suitability of the investment for any of the Plans or their participants, historically the

spreads that Prudential has earned on its Fixed Account investment options are enormous and

those spreads serve as source of significant profits for Prudential, which "spreads" bear no

relationship to the services provided to the Plans at issue (and thereby serves to provide

Prudential with unreasonable and excessive compensation).

57.    Pursuant to the Group Contracts, in addition to earning the spread on the Fixed

Account, Prudential charges the Ferguson Plan and other similarly situated Plans separate

account fees (typically referred to as "mortality and expense risk charges" or "wrap fees"),

which are calculated by taking a percentage of the daily value of the Plans' investments in the

Separate Accounts in and through which Prudential purchased, sold and held the shares of the

underlying mutual funds, as well as fees for Plan Trustee services that are calculated and

collected in a similar manner.

58.    The Group Contracts also obligate the Ferguson Plan and other similarly situated

Plans to pay Prudential brokerage commissions, transfer taxes and any expenses incurred by

Prudential, and which Prudential determines are reasonably necessary to preserve or enhance the

value of the assets in the sub-accounts (which are expressed in terms of accumulation units

discussed below) representing these Plans' ERISA-qualified retirement investments.

59.     The Group Contracts do not meaningfully disclose that revenue sharing payments will be made to Prudential by the mutual funds offered as investments to the Plans or that Prudential will utilize the investments in the Separate Accounts and Fixed Accounts to generate profits based upon the existence and leveraging of these assets for Prudential's own benefit.

**C.    The Plans**

60.     At all pertinent times, the Ferguson Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan.  The Ferguson Plan's participants, as well as Ferguson Enterprises, Inc., have funded and continue to fund the Plan.

61.     Under the Plans, and through the Group Contracts with Defendant, participants are entitled to invest in various mutual funds selected by Prudential for inclusion as investment options within the Plans.

62.     Plaintiff is informed and believes that thousands of qualified ERISA retirement Plans are members of the Class (as defined below), which contracted with Prudential to provide the same or similar services with respect to the management and administration of the Plans and the disposition, investment and management of these Plans' assets.

**D.    The Relationship Between and Among Class Members, Prudential and The Mutual Funds**

63.     The employers that are the sponsors and plan administrators of the Plans, which compose the Class, engage full-service providers, such as Prudential, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative, investment, management and other services necessary to operate them.  Agents of Prudential

solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for Prudential receive commissions for obtaining such business for Prudential.

64. In promoting its services, Defendant claims to be a leading provider for corporate retirement plans that offers a comprehensive array of retirement solutions for its customers.

65. After setting up qualified ERISA retirement plans such as the Plans, Prudential provides all of the services necessary for such retirement plans to operate, including recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

66. At all pertinent times, Prudential knew about the material importance of fees and costs to the Plans and their participants, including the amount of any "revenue sharing payments."

67. Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services. Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees or 12b-1 fees. Investors thereby effectively pay fees to the mutual funds for these and other services. The mutual funds determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing

the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares.  As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by Prudential in the Separate Accounts decreases by a corresponding percentage, which, in turn, reduces the value of each of the Plans' and each of the participants in the Plans' accumulation of units held by Prudential in the Separate Accounts.

68.     At all relevant times, the mutual funds offered by Prudential to the Plans have been offered through Group Contracts and similar arrangements.  Certain of these funds have been owned and/or operated by Prudential itself or its subsidiaries or affiliates.  In addition, Prudential offers certain sub-advised mutual funds for which it consistently and unnecessarily charges the Plans and their participants excessive and unnecessary fees and expenses.  Sub-advised funds offered by Prudential are simply smaller versions of larger mutual funds and hold the same stock proportions of investments as the larger mutual fund but, in the case of the sub-advised mutual fund, because there are two management companies being paid (one of which is Prudential and which performs no meaningful services in return for the compensation it is paid), the effect is that the Plans pay layered and excessive fees for the same investments they could obtain without the "sub-advisory" structure designed and created by Prudential for its own benefit and account.

69.     In return for the fees and other amounts charged to the Plan and other similarly situated Plans, Prudential selects, maintains and monitors a menu of mutual funds available for investment by these Plans while, as explained above, reserving the right to unilaterally change the composition of the menu of mutual funds.

70.     Pursuant to its contracts with the Ferguson Plan and other similarly situated

ERISA retirement Plans, Prudential has the discretion to unilaterally cease offering mutual funds

selected by participants and substitute, in their place, other investments selected by Prudential.

Prudential has added, removed or substituted offerings of mutual funds on its menu of available

investments for current and future Plans.

71.     Under the Group Contracts, Prudential retains the unfettered and sole discretion to

delete any Separate Account and the corresponding mutual fund investment established in the

Separate Account and to offer new Separate Account investments.

72.     Prudential retains the discretion, authority and control to delete and add

investment options from the Plans' available menu of investments.

73.     Prudential also retains the right and discretion to unilaterally change its

investment management and administrative charges assessed under the Group Contract.

74.     Prudential has engaged investment advisors and other professionals to review the

investment options available to participants in the Plans, allegedly to ensure that the investment

options comprise a wide array of asset classes and money managers that can be used to build a

well-diversified retirement program for 401(k) participants, as well as to manage certain

proprietary funds offered by Prudential.  Prudential's primary criterion for inclusion of a mutual

fund on its menu of funds, as well as the selection of advisors to manage proprietary mutual

funds, including so-called sub-advised funds, however, is the amount of revenue sharing

payments or other compensation that the mutual fund is willing to pay Prudential, and this

criterion trumps the appropriateness of the investment and/or the size of fees and costs that the

Plans (and their participants) will be required to pay as a result of, *inter alia*, asset-based charges and the share classes of the designated mutual funds. Indeed, in its marketing and other materials, Prudential attempts to conceal the nature of the higher cost share classes that it includes in its retirement offerings as providing certain advantages to Plans when, in fact, the only reason for the inclusion of these higher cost share classes of the mutual funds is that (a) the mutual funds can use these higher fee share classes to earn greater compensation, and (b) Prudential can share in this increased compensation in the form of revenue sharing payments/kickbacks.

75. The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the revenue sharing payments that they have agreed to make to Prudential.

76. The revenue sharing payments do not bear any relationship to any services performed by Defendant. In fact, Prudential cannot ascribe specific services performed to the revenue sharing payments received and, when Prudential obtains increased revenue sharing payments from mutual funds, it provides no additional services. Instead, Prudential literally has lined its pockets with tens of millions of dollars in revenue sharing payments by and through self-dealing, other prohibited transactions and breaches of its fiduciary duties.

77. In certain materials available to customers, Prudential has recently, obliquely and deceptively referenced its receipt of revenue sharing payments, including 12b-1 fees, service fees and sub transfer agency/expense reimbursement fees. In referencing such revenue sharing payments, however, Prudential has attempted to mask the nature of these kickback payments by

falsely and deceptively claiming that the payments relate to the provision of services by Prudential on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that Prudential purportedly provides on behalf of the mutual funds.  In addition, although Prudential has claimed in certain communications that the revenue sharing payments are used to reduce the amount of payments made by the Plans, Prudential has not and does not provide any specific credit to the Plans to account for the revenue sharing payments that it receives (and Prudential has not calculated or directly attributed the reduction in any fees charged to the Plans to the actual amount of revenue sharing payments received by Prudential).  Moreover, Prudential never has credited the Plans with the amount of revenue sharing payments it receives on a dollar-for-dollar basis.

78.     At all pertinent times, Prudential's receipt of the revenue sharing payments and other improper compensation delineated in this Complaint was fraudulently and deceptively concealed by Prudential.  Although Prudential advises, at times, that certain mutual funds and bank collective trusts, or their affiliates, compensate Prudential for investment and recordkeeping services and asserts that its investment Fact Sheets provide greater detail regarding these revenue sharing payments, in fact, Prudential fails and refuses to provide meaningful information regarding these revenue sharing payments in any of its supposed "disclosures," while falsely representing that the revenue sharing payments are made in return for services rendered.

79.     Even assuming *arguendo* that Prudential contends that it somehow adequately disclosed the existence and nature of these revenue sharing payments, regardless of how it

obscured such disclosure (or purports to assert that any of the Plans consented to its conduct), Prudential's receipt of revenue sharing payments for its own account is *per se* unlawful and cannot be excused by alleging that there was any purported disclosure or consent. Similarly, Prudential's receipt of compensation on its own account, by leveraging the assets contained in the Separate Accounts and the Fixed Accounts, which amounts to self-dealing and the self-payment to Prudential of unreasonable compensation through the investment and use of the Plans' retirement assets, violates applicable law (specifically, ERISA).

80.     While effectively keeping the revenue sharing payments a secret from its customers and the Plans, Prudential regularly negotiates with mutual funds to increase the amount of these payments despite the undesirable impact of increased payments on Plaintiff, the Ferguson Plan and the Plans.

E.     **The Revenue Sharing Scheme**

81.     Prudential holds itself out to the Plans in the Class and the public as an expert in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations.

82.     At all pertinent times, Prudential implemented and participated in a scheme whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through Prudential.

83.     To implement this scheme, Prudential negotiated revenue sharing agreements with mutual funds on behalf of itself and its affiliates.

84.     Revenue sharing payments are made to Prudential pursuant to written contracts

-26-

("revenue sharing contracts" or "participation agreements"), which are often also referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and these contracts are often entered into by and between Prudential and the mutual funds or the investment management firms that provide management and other services to mutual funds.

85.    These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent fees and/or similar fees.  All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the investments by the Plans in the mutual fund.

86.    While the revenue sharing payments are often described in participation agreements as reimbursements for expenses incurred in providing services to the mutual funds, those services by which mutual funds may incidentally benefit are actually ones that Prudential had historically provided to the Plans as a necessary part of its business in return for the fees directly collected by it, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund.

87.    The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through Prudential.  These amounts are not based on the cost of providing the services or a reasonable fair market value for Prudential's services.  Typically, the fees for Prudential's services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis.  Furthermore, the

reasonable fair market price of Prudential's services would be significantly less than the amounts of the revenue sharing payments it received. Finally, Prudential earns disproportionate profits on the basis of the revenue sharing payments it receives.

88.     At all pertinent times, Prudential has been arranging for, receiving and keeping the revenue sharing payments for its own use and benefit in breach of its fiduciary duties under ERISA. These revenue sharing payments range from twenty-five (25) basis points of the total assets of the Plans to substantially greater revenue sharing payments.

89.     Under all of the circumstances, the revenue sharing payments received by Prudential constitute excessive fees and otherwise violate ERISA because the receipt of these revenue sharing payments results in prohibited transactions under ERISA.

**F.     Prudential Also Improperly Earns Income On The Fixed Account And Separate Accounts Through Its Conflicted Arrangements And Self-Dealing**

90.     Prudential also earns excessive compensation in breach of its fiduciary and legal duties through the "spreads" that it earns on the investments in the Fixed Account. As explained above, Prudential effectively engages in self-dealing by establishing its own compensation with respect to the investment of these retirement assets, which excessive compensation Prudential assiduously conceals from the Plans and their participants. Since Prudential guarantees no return on the Fixed Account investments, it is indisputably a fiduciary under applicable law with respect to those investments.

91.     Prudential also has utilized investments in the Separate Accounts through leveraging and securities lending schemes to earn additional, undisclosed compensation and these acts of self-dealing have resulted in Prudential earning additional, undisclosed and

excessive compensation as a result of its use of the Plans' retirement assets for its own profit and gain.

92.     Defendant also has earned excessive and unlawful compensation in the form of sub-advisory and other fees with respect to purported, proprietary mutual funds.  Prudential self-determines its compensation with respect to these proprietary funds and sub-advised funds and such compensation is excessive, bears no relationship to the services rendered and is unreasonable in its nature.

## V.     CLASS ACTION ALLEGATIONS

93.     This action is brought as a class action by Plaintiff individually and in a representative capacity on behalf of the Plan and the following proposed class ("Class"):

### Class

All employee pension benefit plans covered by the Employee Retirement Income Security Act of 1974 subject to Internal Revenue Code §§ 401(a) or 401(k) with which Prudential has maintained a contractual relationship based on a group annuity contract or group funding agreement.

Excluded from the Class are Defendant, any employee pension benefit plans for which Defendant's directors, officers or employees are beneficiaries and any employee pension benefit plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.

94.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

95.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of

Class members throughout the United States. As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

96. **Commonality**. There are numerous questions of fact and/or law that are common to the Plan and all the members of the Class, including, but not limited to the following:

(a) whether Defendant has acted and continues to act as fiduciary under ERISA in connection with the conduct described herein;

(b) whether Defendant has engaged in prohibited transactions by receiving the revenue sharing payments for its own benefit and otherwise earning excessive compensation and effectively charging excessive fees for the administrative, management and investment services it provides to the Plans;

(c) whether Defendant has breached its fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(d) whether Defendant has failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees and compensation received by Prudential; and

(e) whether and what form of relief should be afforded to Plaintiff and the Class.

97. **Typicality**. Plaintiff, who is a representative of the Plan and the Plans, has claims that are typical of all of the members of the Class. Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendant and arise under the same legal theories that are applicable as to all other members of the Class.

98.  **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

99.  **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

100.  **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendant's breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendant, the claims of the virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

101.  **Manageability**.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation

and distribution of damages to Class members would be essentially a ministerial function.

102.     Defendant has acted on grounds generally applicable to the Class by uniformly subjecting Class members to the revenue-sharing scheme and other conduct described above, which scheme Defendant clearly intends to continue to perpetrate in the future.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

**COUNT I**
**(For Breach Of Fiduciary And Violation Of ERISA's Prohibited Transaction Rules)**

103.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

104.     Defendant is a fiduciary of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and is a fiduciary based on its discretion, authority and/or control with respect to the administration, management and/or disposition of the Plans and their assets, and its provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendant's authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

105.     Defendant controls the selection of the mutual funds available as investment options for the Plans and their participants, provides investment advice for compensation with respect to these investment options, uses its custody, control, ownership and dominion over the Separate Accounts and accumulated units of assets of the Plans and uses its discretionary authority and responsibility in the administration of the Plans to obtain revenue sharing

payments from the mutual funds and to earn other compensation from self-dealing as described above.

106.     Defendant is prohibited from receiving benefits in connection with its position as a fiduciary of the Plans.

107.     The revenue sharing payments made by the mutual fund companies to Prudential constitute plan assets because: (a) Prudential receives the payments as a result of its fiduciary status or function (*e.g.*, because Prudential receives payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to Prudential at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge but also the amount of the revenue-sharing payments they have to make to Prudential); and/or (c) revenue-sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

108.     Prudential is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them, either directly or through its subsidiaries or affiliates, as well as self-determining its excessive compensation, as described above.

109.     Prudential has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

110.     Prudential has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plans, their participants and/or beneficiaries in connection with transactions involving the Plans.

111.     Prudential's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by Prudential amounts to and constitutes a fiduciary receiving consideration in the form of revenue sharing payments for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the separate accounts or sub-accounts, and/or represented by the accumulation units.  Specifically, the mutual funds deal with the Plans by accepting funds from Separate Accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans.  Furthermore, as explained above, Prudential also has engaged in prohibited transactions with respect to its control over the investments in the Fixed Account and Separate Accounts and its earning of improper and excessive compensation through acts of self-dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

112.     Pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Prudential is liable to the Plans to credit back, disgorge and/or make restitution of all revenue sharing payments and other improper compensation received by it; or, alternatively, Prudential is

liable to the Plans and the Class to pay damages or make restitution to the Plans in an amount representing the difference between the revenue sharing payments and other compensation that it received, and the reasonable fair market value of any services provided to the Plans by Prudential.

113.     Plaintiff and the Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

114.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), the Class seeks an Order declaring that the above-described practices of Prudential in connection with the revenue sharing payments and its earning of excessive compensation through self-dealing violate ERISA, as set forth above, and seeks a permanent injunction preventing Prudential from engaging in such conduct in the future.

## COUNT II
### (For Breach Of Fiduciary Duty)

115.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

116.     Prudential's arranging for and retention (or the retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Prudential failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

117.    Prudential also breached its fiduciary duties by using its discretion and control over or influence with respect to the Fixed Account and Separate Accounts, as well as their accumulation units, to generate the revenue-sharing payments and other improper compensation for its own benefit.  Prudential did not use the Fixed Account, Separate Accounts and the accumulation units for the exclusive purpose of providing benefits to the Plans' participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person.  As to the revenue sharing payments themselves, to the extent they constitute Plan assets, Prudential failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.  Finally, as set forth above, Prudential breached its fiduciary duties by earning excessive compensation on its own account.

118.    As a direct result of Defendant's breaches of duties, Plaintiff and the Class have suffered losses and damages.

119.    Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendant is liable to restore to the Plans the losses they have suffered as a direct result of Defendant's breaches of fiduciary duty and is liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

120. Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

121. In the alternative, to the extent that Prudential is not deemed a fiduciary or co-fiduciary under ERISA, Prudential is liable to the Class for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment against Defendants, Prudential Retirement Insurance and Annuity Company, Prudential Bank & Trust, FSB and Prudential Investment Management Services, LLC, for the following relief:

(a) Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as detailed above;

(b) Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c) Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d) Attorneys' fees, costs and other recoverable expenses of litigation; and

(e) Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

**<u>NOTICE PURSUANT TO ERISA § 502(h)</u>**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h),

the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

receipt requested.

Dated: December 18, 2015                          Respectfully submitted,

                                          /s/  Laurie Rubinow
                                          Laurie Rubinow
                                          James E. Miller
                                          Shepherd Finkelman Miller
                                            & Shah, LLP
                                          65 Main Street
                                          Chester, CT 06412
                                          Telephone: (860) 526-1100
                                          Facsimile:  (866) 300-7367
                                          Email: lrubinow@sfmslaw.com
                                                jmiller@sfmslaw.com

                                          Ronald S. Kravitz
                                          Kolin C. Tang
                                          Shepherd Finkelman Miller
                                          & Shah, LLP
                                          One California Street, Suite 900
                                          San Francisco, CA 94111
                                          Telephone: (415) 429-5272
                                          Facsimile:  (866) 300-7367
                                          Email: rkravitz@sfmslaw.com
                                                ktang@sfmslaw.com

                                          Nathan Zipperian
                                          Shepherd Finkelman Miller
                                          & Shah, LLP
                                          1640 Town Center Circle, Suite 216
                                          Weston, FL 33326
                                          Telephone: (954) 515-0123
                                          Facsimile:  (866) 300-7367
                                          Email: nzipperian@sfmslaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile:  (818) 609-0892
Email: sahagii@aol.com

*Attorneys for Plaintiff*
*and the Proposed Class*