## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD A. ROSEN, | : | CIVIL ACTION NO. |
| On Behalf of the Ferguson Enterprises, Inc. | : | 3:15-cv-1839-VAB |
| 401(k) Retirement Savings Plan and On Behalf | : | |
| of All Other Similarly Situated Employee | : | AMENDED |
| Benefit Plans, | : | CLASS ACTION COMPLAINT |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | JURY TRIAL DEMANDED |
| PRUDENTIAL RETIREMENT INSURANCE | : | |
| AND ANNUITY COMPANY, PRUDENTIAL | : | |
| BANK & TRUST, FSB, CAPFINANCIAL | : | |
| PARTNERS, LLC d/b/a CAPTRUST | : | |
| FINANCIAL ADVISORS AND | : | |
| FERGUSON ENTERPRISES, INC., | : | |
| | : | |
| Defendants. | : | |

Plaintiff, Richard A. Rosen ("Plaintiff"), by and through his undersigned counsel, in

support of this Amended Complaint, hereby pleads and avers as follows:

## I.  INTRODUCTION

1.  Personal savings accounts in the form of 401(k) and other defined contribution

plans have become the primary method for employees in the United States to save for retirement

in recent years.  The importance of defined contribution plans to the United States retirement

system has become increasingly pronounced as employer-provided defined benefit ("DB") plans

have become increasingly rare as an offered and meaningful employee benefit.

2.  Prudential (defined below) acts as the "service provider" and a fiduciary for

thousands of 401(k) retirement plans in the United States.

3.  Prudential has entered into revenue sharing agreements and similar arrangements

to receive indirect compensation ("revenue sharing contracts" or "participation agreements") with various mutual funds, affiliates of mutual funds, its own affiliates, mutual fund advisors, sub-advisors, investment funds, including collective trusts, registered investment companies and other investment advisors, instruments or vehicles (collectively, "mutual funds"), pursuant to which Prudential receives these revenue sharing payments, which amount to kickbacks and/or other disguised, opaque and prohibited compensation for its own benefit from these mutual funds in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, *et seq*. (*i.e.*, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

4.     The revenue sharing payments at issue are essentially part of a pay-to-play scheme in which Prudential receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer agent fees, other indirect compensation and/or similar fees (the "revenue sharing payments" or "RSPs") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

5.     Prudential also otherwise earns excessive fees and improperly influences its own compensation through a variety of means detailed below.

6.     Prudential invests the retirement assets of the Plan (defined below) and the Plans in the mutual funds generally through insurance company pooled separate accounts, common or collective trusts, individual trusts and similar vehicles and, by and through each instrument by which it accomplishes such investments, Prudential influences its own compensation, earns

excessive compensation and otherwise fails to act in the best interests of the retirement plans it services and their participants.

7.      Insurance company separate accounts (the "Separate Accounts," defined more specifically below) are commingled investment vehicles that aggregate assets from more than one retirement plan and generally are made available through group annuity contracts or group funding agreements issued by insurance companies to qualified retirement plans, such as 401(k) plans.  As of December 31, 2014, over $152 million of the assets of the Plan (defined below) were invested in Prudential's Separate Accounts.  These assets of the Plan were invested in mutual funds, one of which is managed and operated by a Prudential affiliated entity, which pay Prudential RSPs in connection with these Separate Account investments in violation of ERISA.

8.      Prudential uses its ownership and control over Separate Accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are generally deducted directly from the retirement assets of the Separate Accounts.  Prudential has acknowledged its fiduciary status under ERISA, *inter alia*, by virtue of its ownership and control of these Separate Accounts, as well as the discretion, authority and control it holds and exercises with respect to the Separate Accounts.

9.      A common or collective trust ("Collective Trust") is an instrument by which a trustee holds the assets of many plans under one trust instrument.  As of December 31, 2014, over $254 million of the assets of the Plan (defined below) were invested in Prudential's Core

Conservative Bond Fund (the "Core Bond Fund" or the "Stable Value Fund") through one of

Prudential's Collective Trusts in connection with a Synthetic Guaranteed Insurance Contract (the

"Synthetic GIC") between Prudential and the Plan (defined below).  The Stable Value Fund is

invested through the Prudential Trust Company Collective Trust, which is owned, managed and

operated by a Prudential affiliate, Prudential Trust Company (a Pennsylvania trust company), and

which also may facilitate investments in other mutual funds by and through Collective Trusts.

No claims are asserted in this action with respect to the Stable Value Fund or the Synthetic GIC.

10.     The retirement assets of the Plans invested through Collective Trusts also may

include investments from Separate Accounts with the Separate Accounts being treated as assets

of the Collective Trusts.

11.     Prudential, by and through Prudential Trust (defined below), also enters into

individual trust agreements ("Trust Agreements") with the Plans, including the Plan, pursuant to

which the retirement assets of the Plans are invested in mutual funds through trusts (the

"Participating Trusts"), which may then be invested through Collective Trusts.  As of December

31, 2014, independent of mutual fund investments through the Separate Accounts, over $786

million of the assets of the Plan were invested in such mutual funds through one of the

Participating Trusts and/or Collective Trusts (collectively, "Trusts") established with respect to

the Plan.  In light of the nature of its trust agreements with its retirement plan customers, the

Trusts operate in a manner that is akin to Prudential's Separate Accounts for all intents and

purposes, with Prudential taking legal ownership and title to the retirement assets in these trusts.

12.     Prudential uses its ownership and control over the Trusts and these trusts' assets

-4-

to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios and fees of the mutual funds, which reduce the amount of retirement assets of the Plans.  Prudential has specifically acknowledged its fiduciary status under ERISA by, *inter alia*, virtue of its ownership and control of these Trusts, as well as the discretion, authority and control it holds and exercises with respect to these trusts.

13.     The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by Prudential and/or based on the magnitude of the investments by such retirement plans in the mutual fund.

14.     While the revenue sharing payments are often internally described by service providers, such as Prudential, as "services fees" and reimbursement for expenses incurred in providing services for, to, or on behalf of the mutual funds, and deceptively characterized as such to retirement plans and their participants (thereby concealing their true nature), the amounts of the RSPs bear absolutely no relationship to the cost or value of any such services.  Indeed, Prudential performs the same services regardless of the amount of revenue sharing payments, if any, made to it.  As a result of its acceptance of these unlawful payments, Prudential occupies a conflicted position whereby it effectively operates a system in which it is motivated to increase the amount of such payments, while improperly requiring certain plans and/or participants who invest in mutual funds and similar investments that provide higher amounts of revenue sharing payments to incur and pay unreasonably high fees for the services provided.  Prudential also fails to appropriately credit the amount of RSPs on a dollar-for-dollar basis for the benefit of the Plans

and their participants in breach of its fiduciary duties to the Plans and their participants.

15.    The services provided by Prudential that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that Prudential has historically provided to its retirement plan customers as a necessary part of its business in return for fees directly collected by it from such customers, and these fees generally did not change as a result of Prudential's receipt of the RSPs from the mutual funds and were not reduced in a manner that corresponds with the amount of revenue sharing payments received.

16.    Prudential's receipt of the revenue sharing payments at issue violates ERISA's prohibited transaction and fiduciary duty rules and should not be countenanced, since the receipt of such payments places Prudential in a conflicted position in which, *inter alia*, the interests of its retirement plan customers can be and are sacrificed in the interest of Prudential earning greater profits through the receipt of revenue sharing payments.

17.    As explained below, Prudential also has engaged in acts of self-dealing with respect to the retirement assets of the Plans (defined below) and the Class (defined below) held in the Separate Accounts (defined below) and the Trusts, as well as with respect to certain proprietary and/or sub-advised mutual funds and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as ERISA's fiduciary rules.

18.    As explained below, the Ferguson Defendants (defined below) have breached their fiduciary duties by causing the Plan to pay grossly excessive fees to Prudential and certain mutual funds (as defined above) with respect to the retirement services provided to the Plan

and/or by failing to appropriately monitor the conduct of Prudential and, as a result of such breaches of fiduciary duty, the Sub-Class (defined below) has suffered significant harm and losses.

19.    This is an action for equitable relief and losses suffered under ERISA in which Plaintiff seeks to recover, for the benefit of the 401(k) plans in the Class and all other similarly situated retirement plans and entities (collectively, the "Plans"), also known as employee pension benefit plans under ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) that are subject to Internal Revenue Code Sections 401(a) and 401(k), as well as the Sub-Class (defined below), the revenue sharing payments and other compensation that Prudential has improperly received, as well as the excessive compensation that has been paid by the Plan, its participants and beneficiaries as a result of the Ferguson Defendants' breaches of fiduciary duty.

20.    Plaintiff brings this action on behalf of the Plan and on behalf of all other similarly situated Plans under ERISA §§ 409(a) and 502(a) and (g), 29 U.S.C. §§ 1109(a) and 1132(a) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Prudential and the Ferguson Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments and other compensation improperly received by Prudential, or, alternatively, the profits earned by Prudential in connection with its receipt of such revenue sharing payments and other unlawful compensation;

- Damages in the form of all losses suffered by the Plans and all other recoverable damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

21.     Plaintiff is a former participant of the Ferguson Enterprises, Inc. 401(k) Retirement Savings Plan f/k/a Wolseley North America 401(k) Plan ( the "Ferguson Plan" or the "Plan").  At all pertinent times, as discussed more fully below, Prudential acted as a service provider for and a fiduciary of the Plan, as well as all of the Plans.  Plaintiff brings this action in a representative capacity on behalf of the Plan and all other similarly situated Plans (collectively, the "Plans"), as well as on behalf of the Class (defined below) and Sub-Class (defined below). Plaintiff is a resident of Oak Park, Ventura County, California.

22.     Defendant, Prudential Retirement Insurance and Annuity Company ("PRIAC"), is an insurance company with its principal place of business in Hartford, Connecticut.  PRIAC is self-described as a "Prudential Financial" company, with Prudential Financial being a service mark of The Prudential Insurance Company of America and its affiliates.  "Prudential Retirement" is self-described as a "Prudential Financial" business unit.  The group annuity contracts and/or group funding agreements (discussed more fully below and defined as the "Group Contracts") of "Prudential Retirement" are issued by PRIAC.  PRIAC also issues insurance and/or investment products known as "institutional sub-advised funds," which are offered as investment options to the Plans.  PRIAC is a fiduciary to the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

23.     Defendant, Prudential Bank & Trust, FSB ("Prudential Trust"), also is a

Prudential Financial company and serves as the Trustee to the Plan, as well as many, if not all, of the Plans.  As a technical matter, Prudential Trust acts as the "contractholder" of the Group Contracts (defined below) for the Plans in its capacity as the Trustee for the Plans.  As a result, under the terms of the Contract, Prudential Trust has the authority, control and discretion to, *inter alia*, add, delete or substitute the investment options available to the Plans, as well as to make investment decisions on behalf of the Plans and to allocate any revenue sharing payments received by Prudential Trust.  Prudential Trust will not act as the trustee for the Plans' retirement funds unless PRIAC is engaged as the service provider by the Plans.  Prudential Trust also maintains its principal place of business in Hartford, Connecticut at the same address as PRIAC. Prudential Trust is a fiduciary to the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

24.     PRIAC and Prudential Trust are and function as alter egos of each other, as a joint entity, as an integrated enterprise and/or as agents of each other in the form of "Prudential Retirement."  At all pertinent times, PRIAC and Prudential Trust shared the same or overlapping offices, executives and employees and acted without regard for the corporate formalities between them.  Each of the Defendants is legally responsible for the actionable conduct detailed in this Complaint since, at all pertinent times, the employee and labor relations, as well as the compensation and benefit activities and the sales and marketing policies and procedures of PRIAC and Prudential Trust, have operated from and through a mechanism of centralized control within Prudential Retirement.

25.     PRIAC and Prudential Trust share employees, operate under a system of

centralized and consolidated labor and employee relations, and do not operate at arms' length vis-a-vis each other.  Unless otherwise noted, PRIAC and Prudential Trust are referred to collectively hereafter as "Prudential" or "Prudential Retirement" or "Prudential Financial." Prudential is a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

26.     Defendant, CapFinancial Partners, LLC d/b/a CapTrust Financial Advisors ("CapTrust"), is a co-fiduciary of the Plan and provides investment advice to the Administrator of the Plan.  CapTrust maintains its principal place of business in Raleigh, North Carolina, and maintains offices throughout the United States, including in this judicial district.  CapTrust is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

27.     Defendant, Ferguson Enterprises, Inc. f/k/a Wolseley Investments, Inc. ("Ferguson"), is the Administrator of the Plan.  Ferguson maintains its principal place of business in Newport News, Virginia, and maintains offices throughout the United States, including in this judicial district.  Ferguson, which acts by and through a Retirement Plan Committee appointed by its Board of Directors and an Investment Committee with respect to the Plan (the past and present identities of whom are currently unknown to Plaintiff), is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

28.     CapTrust and Ferguson are referred to collectively herein as the "Ferguson Defendants."

### III.   JURISDICTION AND VENUE

29.     Plaintiff seeks relief on behalf of the Ferguson Plan and all other similarly situated Plans pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Sections 409 and 502, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

31.     Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Prudential maintains its headquarters and principal place of business in Hartford, Connecticut, and virtually all of the key documents, witnesses and information regarding the Plan and the Plans (defined below) are located in the State of Connecticut.

32.     At all pertinent times, Prudential has conducted its retirement business and the retirement business of all other Prudential affiliates and entities from its offices in this judicial district in Hartford, Connecticut, which functions as the nerve center for the retirement operations of Prudential, which is known and sometimes referred to as "Prudential Retirement."

### IV.   BACKGROUND FACTS

#### A.     The Services That Prudential Provides To The Plans

33.     At all pertinent times, Prudential Retirement has held itself out and continues to hold itself out to Plaintiff, the Plans and the Class as providing a full array of services, and represents that Prudential can help design and maintain a long-term retirement strategy for a

company and its employees.

34.     As Prudential explains on its website with respect to retirement services in general:

> Providing Innovative Retirement Solutions for more than 85 Years
>
> A Rock Solid® provider with $1.176 trillion in assets under management, Prudential Financial has provided clients with financial solutions since 1875.
>
> An insurance leader for more than 135 years, Prudential Financial offers innovative ways to manage risk and provide guaranteed retirement income.
>
> An integral part of that tradition for the past 88 years, Prudential Retirement delivers retirement plan solutions for public, private, and nonprofit organizations. Our services include state-of-the-art recordkeeping, administrative services, investment and risk management, comprehensive employee communications, and trustee services.

http://www.retire.prudential.com/view/page/rs/16962.  Prudential Retirement has more than 5,000 clients, services more than 3.5 million participants and administers over $360 billion of assets.  As Prudential consistently assures its retirement customers, "[w]hen it comes to your financial health, remember: Prudential Retirement® can help you plan for a more financially secure future."

35.     Similarly, with respect to the services it provides to defined contribution plans, including 401(k) plans, Prudential describes its services as follows:

> We have taken what we do best—balancing growth and protection—and applied our depth of experience to transform how our nation saves for retirement via employer-sponsored plans. Our philosophy focuses on four key disciplines that, when used together, result in a powerful combination:

Smart plan design
Streamlined processing
Investments and guaranteed income
Lifelong education

http://www.retire.prudential.com/view/page/rs/16959.

36.     As described above, Prudential's retirement services are provided from a corporate perspective by PRIAC and Prudential Trust, as well as other affiliated Prudential entities, all of which act in concert with each other.

37.     The Plans' assets that are held in the Separate Accounts (defined below) are included in the over $250 billion in Separate Account assets that Prudential has under management, which are included in the over $700 billion in assets on Prudential's balance sheet. Ironically, although Prudential markets use of its Separate Accounts as a manner, means and way to avoid the effects of revenue sharing payments, including the prospect that certain Plans and their participants are forced to shoulder excessive fees as a result of the revenue sharing payments associated with their investments, Prudential has no actual process or policy in place to effectively avoid the pernicious effect of such unlawful payments, despite its obligation as a fiduciary to do so.  Specifically, in its own publications trumpeting its Separate Accounts, Prudential observes that "[t]he allocation of revenue sharing among participant accounts is emerging as a fiduciary issue for participant-directed defined contribution plans, such as 401(k) plans" and that "'the method of allocation is a fiduciary function that is governed by ERISA's general fiduciary duty and prohibited transaction rules...,'" while asserting that "Insurance Company Separate Accounts provide an opportunity to reduce this disparity by either 'levelizing' revenue sharing across all participants, or eliminating revenue sharing altogether and charging a

-13-

separate flat administrative fee."  http://research. prudential.com/documents/rp/ Insurance_Company_Separate_Accounts.pdf, *quoting Fiduciary Issues Related to the Allocation of Revenue Sharing* by Fred Reish and Bruce Ashton (July, 2011).  But despite that acknowledgment and assertion, as well as Prudential's acknowledged status as a fiduciary with respect to the Separate Accounts, Prudential's Separate Accounts for the Plans neither levelize revenue sharing across all participants nor eliminate revenue sharing altogether by simply charging a direct, separate, flat administrative fee that is identifiable and transparent in nature. Thus, Prudential's representations regarding its Separate Accounts are both false and misleading in nature.

38.    Prudential is considered a leader in providing services to the employer retirement markets, which markets include retirement plans such as the Plan.  Prudential markets itself as providing Plans, such as the Ferguson Plan, with the full range of services sufficient to offer retirement benefits to its employees.

39.    One of Prudential's most profitable lines of business is providing services associated with retirement and benefit plans.  Prudential has thousands of 401(k) plan customers and ranks in the top five of all 401(k) providers in the United States based upon assets under management.

40.    The retirement plan services Prudential provides include recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administrations, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and

withdrawals, and administration of communications with participants.

**B.    The Agreements Between The Plans And Prudential And The Retirement
Investments Provided Under Those Agreements**

41.    Pursuant to the terms of group annuity contracts or group funding agreements (the "Contracts" or "Group Contracts"), Prudential represents that it manages the retirement plan assets of the Plans.  Prudential enters into such standard form Group Contracts with virtually all of the Plans.

42.    Pursuant to the Group Contracts or similar group funding agreements, Prudential has provided (and provides) investment options to the Ferguson Plan and other similarly situated Plans, through insurance products called group variable annuities or through similar insurance arrangements/vehicles.

43.    After entering into one of the Group Contracts with the Plans, the Group Contract typically is assigned by the given retirement plan to Prudential Trust, which then collects each of the Plans' retirement contributions and invests them in one of the Separate Accounts, in the Collective Trusts or otherwise in mutual funds through the Trusts.  At times, Prudential also may invest the Separate Accounts into Collective Trusts as a "Participating Trust."

44.    Pursuant to the terms of the Group Contracts, the Plans' retirement assets are invested in one of two general options: (a) a Prudential Stable Value fund or other fixed account (collectively, the "Fixed Account" or "Stable Value Fund"); and (b) mutual funds either directly or through Separate Accounts, Collective Trusts and/or Participating Trusts.  No claims are asserted in this Complaint with respect to the Stable Value Fund.

45.    Prudential owns the Separate Accounts and the Trusts, and indisputably functions

as a fiduciary under applicable law with respect to the assets invested through these instruments. Prudential uses its ownership and control of the Separate Accounts and the Trusts, as well as its ability to deliver retirement assets to mutual funds, as the tool to negotiate revenue sharing or participation agreements with the mutual funds so that it can earn compensation in the form of RSPs that bear no relationship to the services that it provides to the Plans and/or the mutual funds.

46.     Plans and their participants have not historically invested directly in the mutual funds, but invest in "variable accounts," including the Separate Accounts, as well as by and through the Trusts discussed above, all of which are established by Prudential, owned and controlled by Prudential, thereby creating additional layers of fees for Prudential to earn above and beyond the excessive fees it earns under the Group Contracts (which, alone, can equal 150 basis points (1.5%) of assets or higher).  As discussed above and explained in greater detail below, the Separate Accounts and the Trusts that Prudential uses to invest in mutual funds operate in a functionally equivalent manner for all purposes of this litigation.

### 1.     The Separate Accounts

47.     The Separate Accounts are established, administered, owned and managed by Prudential (*i.e.*, PRIAC) and the Separate Accounts' assets are segregated from the general assets of Prudential.

48.     The Separate Accounts are part of an investment vehicle known as a group variable annuity offered by Prudential.  A group variable annuity is an insurance contract that provides for, among other things, "Separate Account" investments.  These types of investment

vehicles are used to fund qualified retirement plans, like 401(k), profit-sharing, and other types of

company-sponsored retirement plans.  The Separate Accounts permit Prudential to pool the

investments of the Plans before collectively investing them in mutual funds and similar

investment vehicles.  The assets of each Separate Account are segregated (or separate) from all of

the other assets of Prudential but are not entirely immune from the claims of creditors of

Prudential.  The Separate Accounts purchase and own selected mutual funds or other

funds/investment vehicles that mimic the performance of these mutual funds.

49.     The Separate Accounts maintained by Prudential correspond to and/or are divided

into sub-accounts that correspond to the mutual funds and other investment options available

under the Group Contracts that Prudential maintains with the Plans.

50.     The Separate Accounts (or their sub-accounts) are divided into accumulation units

(sometimes referred to as "record units") that track the performance of shares of a selected

mutual fund investment with the price per accumulation unit calculated by dividing the total

value of the assets of the Separate Account by the number of units in the Separate Account.

51.     Pursuant to the Group Contracts, participants may choose the mutual funds in

which their contributions and any matching contributions made by their employers are invested,

and Prudential allocates those contributions to particular Separate Accounts or sub-accounts

within the Separate Accounts that correspond to the chosen mutual funds.  In return for the

contributions, which are assets of these ERISA-qualified plans, the Plans and their participants

receive accumulation units (shares) in the applicable sub-accounts of the separate accounts,

which accumulation units, like the Separate Accounts themselves and the sub-accounts, are held

and owned by Prudential.

52.     Prudential maintains discretion, authority and control over the Separate Accounts, the sub-accounts and the accumulation units.

53.     The accumulation units of the Plans and their participants, which are held by Prudential, like the Separate Accounts and sub-accounts, constitute assets of the Plans.

54.     Based on the combined contributions to the sub-accounts made by all of these Plans and their participants, Prudential sells and purchases mutual fund shares to hold in the Separate Accounts (and receives revenue sharing kickbacks in return for these purchases).

55.     The value of a one of the Plans' accumulation units (shares) in the Separate Account fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

56.     Pursuant to the Group Contracts administered and managed by Prudential and issued in the name of Prudential, Prudential manages the retirement assets of the Plans in the Separate Accounts and serves as legal title owner and holder of the assets in the Separate Accounts.  Certain of the investments of the Ferguson Plan and the other Plans are held in Separate Accounts in the name of Prudential, and these investments are administered and managed by Prudential as well.

57.     Prudential exercises discretionary authority and control with respect to the Plans' assets held in the Separate Accounts by, among other things, electing to receive dividends from the mutual funds into the Separate Accounts in the form of additional mutual funds shares and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds

in additional mutual fund shares of the same mutual funds.

58.     Under the terms of its own Group Contracts, and in recognition of its fiduciary status, Prudential holds the Plans' assets in Separate Accounts under and in Prudential's own name before ultimately transferring the Plans' assets to mutual funds in return for which it is paid the revenue sharing payments.

59.     Prudential also influences its own compensation by effectively electing to receive all dividends payable to the Plans from mutual funds in the form of additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Separate Accounts and under Prudential's management and, thus, increasing the amount of RSPs payable to Prudential.

60.     As the owner of the Separate Accounts (*i.e.*, PRIAC) and with Prudential Trust as the trustee of the Trusts and the Contractholder of the Group Contracts for the Plans, Prudential retains the discretion, authority and control to vote the interests of the mutual fund shares held in the Separate Accounts, as well as to engage in securities lending activities with third parties, pursuant to which it earns excessive compensation on its own account in connection with transactions involving the assets of the Plans.

61.     Prudential indisputably holds, owns, administers, manages and controls the Separate Accounts, as well as their sub-accounts, and uses the Separate Accounts as a delivery mechanism to purchase and sell shares in the mutual funds.

62.     In direct return for delivering these funds from the Separate Accounts to the mutual funds, Prudential receives the RSPs.

63.     Prudential owns and manages the Separate Accounts and maintains and exercises

discretion and control with respect to the retirement assets in the Separate Accounts.  Prudential is able to influence and control its own compensation derived from the Separate Accounts by, among other things, negotiating the terms of the participation agreements with the mutual funds, which generally make revenue sharing payments on the basis of the assets invested in their mutual funds.  As detailed in the Group Contracts and its Trust Agreements with the Plans, Prudential maintains complete discretion to substitute, eliminate and add funds within its Separate Accounts, as well as to make other investment decisions.

64.     Prudential also controls the menu of available mutual funds offered in its Separate Accounts and retains the discretion to change its fund menus and to not offer certain investment options to Plans based upon contract pricing and other considerations.

65.      Under the Group Contracts, Prudential also retains and exercises the discretion and control to invest the assets in the Separate Accounts in any manner that it deems permissible and to invest or reinvest the assets of the Separate Accounts at its sole discretion.

66.     Prudential also utilizes the assets contained in the Separate Accounts, all of which appear on its balance sheet, to earn additional compensation independent of the revenue sharing payments by utilizing uncommitted assets in these Separate Accounts to engage in certain securities lending transactions for which it earns excessive compensation on its own account. Thus, Prudential utilizes its ownership and authority over the Separate Accounts, as well as the discretion and control that it exercises over the Separate Accounts, to obtain additional compensation from third parties that it effectively self-determines.

67.     The Group Contracts do not meaningfully disclose that revenue sharing payments

will be made to Prudential by the mutual funds offered as investments to the Plans or that Prudential will utilize the investments in the Separate Accounts to generate profits based upon the existence and leveraging of these assets for Prudential's own benefit.

### 2.    <u>The Trusts</u>

68.     The Trusts are established, administered, owned and managed by Prudential (*i.e.*, Prudential Trust) and the assets of the Trusts are segregated from the general assets of Prudential.

69.     The Trusts permit Prudential to pool the investments of the Plans or one of the given Plans before collectively investing them in mutual funds and similar investment vehicles. The assets of each of the Trusts are segregated (or separate) from all of the other assets of Prudential.  The Trusts purchase and own selected mutual funds or other funds/investment vehicles.

70.     The Trusts maintained by Prudential correspond to and/or are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Group Contracts that Prudential maintains with the Plans.

71.     The Trusts (or their sub-accounts) are divided into accumulation units (sometimes referred to as "record units" or "participation units") that track the performance of shares of a selected investment with the price per accumulation unit calculated by dividing the total value of the assets of one of the Trusts by the number of units in such Trust.

72.     The Trusts permit Prudential to pool the investments of the participants of one of the Plans before collectively investing them in mutual funds and similar investment vehicles. The assets of each of the Trusts are segregated (or separate) from all of the other assets of

Prudential.  The Trusts purchase and own selected mutual funds or other funds/investment vehicles.

73.     Pursuant to the Group Contracts, participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Prudential allocates those contributions to particular Trusts or sub-accounts within the Trusts that correspond to the chosen mutual funds.  In return for the contributions, which are assets of these ERISA-qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the Trusts, which accumulation units, like the Trusts themselves and the sub-accounts, are held and owned by Prudential.

74.     Pursuant to its agreements with the Plans, Prudential Trust agrees to acts as a fiduciary and to abide by all applicable fiduciary standards by discharging "its duties with respect to the [P]lan solely in the interest of the participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in the like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

75.     Prudential takes legal title to all retirement assets of the Plans that it holds in the Trusts.

76.     Prudential Trust only agrees to serve as trustee of the Trusts so long as the Plans maintain one of the Group Contracts or a similar funding medium with PRIAC and utilize the retirement services of PRIAC.

77.     Prudential has the ability, in its sole discretion, to restrict the transfer of retirement

assets between one investment option and another investment option offered to the Plans, as well as to suspend the valuation rights and withdrawal rights of the Plans with respect to the retirement assets invested in the Trusts.

78.     Prudential establishes the investment objectives of each investment fund ("Fund") within the Trusts and has the sole authority and discretion to determine whether any particular investment meets the investment objectives of a Fund.

79.     Prudential also has sole authority, discretion and control to add or delete Funds within the Trusts.

80.     Prudential also retains the authority, discretion and control to establish share classes within each Fund and to determine its own compensation by changing the share class and/or share class description within each Fund.

81.     Prudential also has the authority and control, in its sole discretion, to determine the value of the Funds.

82.     Prudential likewise has the authority and control, in its sole discretion, to engage and/or terminate the services of investment managers for the Funds.

83.     Prudential has the authority and control, in its sole discretion, to determine how the assets of the Trusts shall be invested, reinvested or retained as it deems to be in the best interests of the participants in the Trusts.

84.     Prudential also has the authority and control, in it sole discretion, to engage in securities lending with respect to the retirement assets held in the Trusts for which it earns excessive compensation.

85.     As noted above, the Trusts, like the Separate Accounts, are divided into participation units.

86.     Prudential specifically acknowledges that it acts in a fiduciary capacity with respect to the retirement assets of the Plans in the Trusts and that it is an ERISA fiduciary with respect to the retirement assets held in the Trusts and that it is subject to the requirements of Sections 404, 405 and 406 of ERISA.

87.     Prudential Trust exercises exclusive management and control of the Trusts and each of the Funds in the Trusts.

88.     Pursuant to the Group Contracts administered and managed by Prudential and issued in its own name, Prudential manages the retirement assets of the Plans in the Trusts and serves as legal title owner and holder of the assets in the Trusts.  Certain (if not all) of the investments of the Ferguson Plan and the other Plans are held in the Trusts in the name of Prudential, which investments also are administered and managed by Prudential.

89.     Prudential exercises discretionary authority and control with respect to the Plans' assets held in the Trusts by, among other things, electing to receive dividends from the mutual funds into the Trusts in the form of additional mutual fund shares and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of the same mutual funds.

90.      Under the terms of its own Group Contracts and Trust Agreements, and in recognition of its fiduciary status, Prudential holds the Plans' assets in the Trusts under and its own name before ultimately transferring the Plans' assets to mutual funds in return for which it is

paid the RSPs.

91.     Prudential also influences its own compensation by effectively electing to receive all dividends payable to the Plans from mutual funds in the form of additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Trusts and under Prudential's management and, thus, increasing the amount of RSPs payable to Prudential.

92.     In direct return for delivering these funds from the Trusts to the mutual funds, Prudential receives the RSPs.

93.     Prudential owns and manages the Trusts and maintains and exercises discretion and control with respect to the retirement assets in the Trusts.  Prudential is able to influence and control its own compensation derived from the Trusts by, among other things, negotiating the terms of the participation agreements with the mutual funds, which generally make revenue sharing payments on the basis of the assets invested in their mutual funds.  As detailed in the Group Contracts and its Trust Agreements with the Plans, Prudential maintains complete discretion to substitute, eliminate and add funds within its Separate Accounts and Trusts, as well as to make other investment decisions.

94.     Prudential also controls the menu of available mutual funds offered in its Trusts and retains the discretion to change its fund menus and to not offer certain investment options to Plans based upon contract pricing and other considerations.

95.     The Group Contracts do not meaningfully disclose that revenue sharing payments will be made to Prudential by the mutual funds offered as investments to the Plans or that Prudential will utilize the investments in the Trusts to generate profits based upon the existence

and leveraging of these assets for Prudential's own benefit.

**C.**   **Prudential Influenced Its Own Compensation Through "GoalMaker™"**

96.   Prudential offers the Plans an "optional, easy-to-use asset allocation program, at no additional cost" named GoalMaker™ (which the Plan has adopted and, at times, uses as a default mechanism for investments by its participants), but fails to disclose that Prudential's GoalMaker directly steers participant investments into certain proprietary Prudential mutual funds and other similar mutual funds that are both expensive and unsuitable for most Plans and their participants, but which earn Prudential significant compensation at the expense of the Plans and their participants.

97.   Based upon the Plan's October 31, 2014 Overview of Plan Investment Options and Fees, in addition to the Stable Value Fund, the following investment options are used by Prudential through GoalMaker: American Funds Europacific Growth R6 (49), John Hancock Disciplined Value R5 (79 bps), Mainstay Large Cap Growth I (77 bps), PIMCO Total Return Instl (46 bps), Mid-Cap Growth/Artisan Partners (77 bps), JP Morgan Mid-Cap Value Instl (99 bps), Goldman Sachs Small Cap Value (102 bps), Small Cap Growth/TimeSquare (81 bps) and MFS International Value R5 (76 bps).  Notably absent from the GoalMaker allocation is the availability of any low cost index funds or other suitable alternatives to the expensive, actively managed mutual funds included by Prudential in the asset-allocation "service."

98.   Prudential's GoalMaker involves excessive fees and risks, as well as undisclosed conflicts of interest.  GoalMaker specifically excludes passive and low-cost investment options for the Plans and, as a result, is not an appropriate asset allocation product for the Plans and their

participants.

99.     Prudential's attempt to disguise the true nature of GoalMaker by representing that it is "powered by Morningstar Associates, LLC, a respected industry leader," is particularly deceptive and disingenuous.  Prudential fails to fully or adequately disclose that Morningstar Associates, LLC only is permitted to recommend investments for inclusion in the GoalMaker allocation process from a set of investments hand-picked by Prudential, which have the true (albeit undisclosed) object of earning Prudential significant compensation.  That is one of the reasons why, as discussed below, over 50% of the Plan's assets are invested in Prudential proprietary products, most of which earn Prudential excessive fees.

100.    Upon information and belief, Prudential's GoalMaker is an asset allocation product included in the Plans that involves significant and excessive asset-based revenue sharing and/or shareholder servicing fees based upon the number of participant accounts, none of which is adequately disclosed.

101.    Prudential uses GoalMaker to influence and increase its own compensation, and earn excessive fees, all while failing to adequately disclose to the Plans or their participants the true nature of this product/device and thereby breaching its fiduciary duties to the Plans.

**D.     The Ferguson Defendants' Failure To Ensure That Appropriate Investments Were Included In The Plan And Available To The Plan's Participants**

102.    The Ferguson Defendants had a fiduciary duty to ensure that the fees and expenses incurred by the Plan were fair and reasonable, including ensuring that the expenses associated with the mutual funds offered for investment in the Plan were fair, reasonable and cost competitive.  The Ferguson Defendants also had the obligation to ensure that the Plan offered

appropriate and diverse investment options to its participants.

103.     Although in very recent years, the Ferguson Plan has added some limited, low-cost Vanguard index funds to the investment options available to participants, as a historical matter and to this very day, the expenses associated with the investments in the Plan have been and are grossly excessive, because the investment options made available to the Plan's participants, at all pertinent times, have been focused upon expensive and unsuitable actively managed mutual funds.

104.     The current investment options and fees associated with these mutual funds are generally excessive and imprudent, amounting to four times or more the cost of passively managed mutual funds, with absolutely no justification for this concentration in the Plan on actively managed and extremely expensive mutual funds, which rarely add value or can be justified as investment options, especially in the absence of a broad array of passively managed index funds being also made available.  For example, as reflected in the Plan's October 31, 2014 Overview of Plan Investment Options and Fees, Oakmark Equity & Income I (77 bps), John Hancock Disciplined Value R5 (79 bps), Mainstay Large Cap Growth I (77 bps), Mid-Cap Growth/Artisan Partners (77 bps), JP Morgan Mid-Cap Value Instl (99 bps), Goldman Sachs Small Cap Value (102 bps), Small Cap Growth/TimeSquare (81 bps) and MFS International Value R5 (76 bps), all have expense ratios of 76-102 bps, which are four or more times greater than retail passively managed funds -- which generally were not made available to the Plan and its participants during the pertinent period.

105.     Until very recently, as noted above, there were no Vanguard index funds offered

in the Plan and the S&P 500 index mutual fund previously offered in the Plan charged an astronomical (for an index fund) expense ratio of 30 bps.

106.    Although the fees and expenses in the Plan have improved (albeit marginally) in recent years, examination of the investment options available to the Plan participants and the expenses associated with those investments over the past six years, including the fact that the Plan has only recently migrated from concentrating its investments through Separate Accounts, reveals that the Plan has paid grossly excessive fees during the pertinent period and that the Ferguson Defendants have engaged in significant breaches of fiduciary duty by failing to ensure that the Plan paid reasonable and appropriate fees and by failing to monitor the conduct of Prudential, as well as by including GoalMaker in the Plan without adequately disclosing its true nature to Participants.

**E.    The Plans**

107.    At all pertinent times, the Ferguson Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan.  The Ferguson Plan's participants, as well as Ferguson Enterprises, Inc., have funded and continue to fund the Plan.

108.    Under the Plans, and through the Group Contracts and Trust Agreements with Prudential, participants are entitled to invest in various mutual funds selected by Prudential for inclusion as investment options within the Plans.

109.    Plaintiff is informed and believes that thousands of qualified ERISA retirement Plans are members of the Class (as defined below), which contracted with Prudential to provide the same or similar services with respect to the management and administration of the Plans and

the disposition, investment and management of these Plans' assets.

**F.      The Relationship Between And Among Class Members, Prudential
         And The Mutual Funds**

110.     The employers that are the sponsors and plan administrators of the Plans, which

compose the Class, engage full-service providers, such as Prudential, to design and implement

the qualified ERISA retirement plans and to provide an entire range of administrative,

investment, management and other services necessary to operate them.  Agents of Prudential

solicit business on its behalf on the basis that it is a full-service provider that designs and

implements such qualified ERISA retirement plans, and these agents for Prudential receive

commissions for obtaining such business for Prudential.

111.     In promoting its services, Prudential claims to be a leading provider for corporate

retirement plans that offers a comprehensive array of retirement solutions for its customers.

112.     After setting up qualified ERISA retirement plans such as the Plans, Prudential

provides all of the services necessary for such retirement plans to operate, including

recordkeeping, compliance, allocation of participant contributions, distribution of account

proceeds to departing participants, loan processing and administration, asset transfers, IRS tax

withholding and reporting, provision of benefits illustrations, processing and distribution of

benefits and withdrawals, and administration of communications with participants.

113.     At all pertinent times, Prudential knew about the material importance of fees and

costs to the Plans and their participants, including the amount of any "revenue sharing

payments."

114.     Mutual funds contract with various entities to perform managerial, administrative,

accounting, legal and other services.  Mutual funds pay the entities providing those services, and

the mutual funds pass those costs on to their investors by charging them a variety of fees, which

are typically referred to as investment management fees, distribution fees, commissions,

sub-transfer agency fees, marketing fees or 12b-1 fees.  Investors thereby effectively pay fees to

the mutual funds for these and other services.  The mutual funds determine these fees, based on a

designated percentage of the net asset value of all of the shares held in the mutual fund, causing

the net asset value of all of the shares to decrease by the proportionate percentage attributable to

these shares.  As a result of the charging of these fees, by way of example, the value of the

mutual fund shares held by Prudential in the Separate Accounts and the Trusts decreases by a

corresponding percentage, which, in turn, reduces the value of each of the interests of the Plans

and their participants in the Separate Accounts and the Trusts.

115.    At all relevant times, the mutual funds offered by Prudential to the Plans have

been offered through Group Contracts, Trust Agreements and similar arrangements.  Certain of

these funds have been owned and/or operated by Prudential itself or its subsidiaries or affiliates.

In addition, Prudential offers certain sub-advised mutual funds for which it consistently and

unnecessarily charges the Plans and their participants excessive and unnecessary fees and

expenses.  Sub-advised funds offered by Prudential are simply smaller versions of larger mutual

funds and hold the same stock proportions of investments as the larger mutual funds but, in the

case of the sub-advised mutual fund, because there are two management companies being paid

(one of which typically is Prudential, which performs no meaningful services in return for the

compensation it is paid), the effect is that the Plans pay layered and excessive fees for the same

investments they could obtain without the "sub-advisory" structure designed and created by Prudential for its own benefit and account.

116.    In return for the fees and other amounts charged to the Plan and other similarly situated Plans, Prudential selects, maintains and monitors a menu of mutual funds available for investment by these Plans while, as explained above, reserving the right to unilaterally change the composition of the menu of mutual funds.

117.    Pursuant to its contracts with the Ferguson Plan and other similarly situated ERISA retirement Plans, Prudential has the discretion to unilaterally cease offering mutual funds selected by participants and substitute, in their place, other investments selected by Prudential. Prudential has added, removed or substituted offerings of mutual funds on its menu of available investments for current and future Plans.

118.    The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the revenue sharing payments that they have agreed to make to Prudential.

119.    The revenue sharing payments do not bear any relationship to any services performed by Prudential.  In fact, Prudential cannot ascribe specific services performed to the revenue sharing payments received and, when Prudential obtains increased revenue sharing payments from mutual funds, it provides no additional services.

120.    Prudential never has credited the Plans with the amount of revenue sharing payments it receives on a dollar-for-dollar basis.

121.    At all pertinent times, Prudential's receipt of the revenue sharing payments and

other improper compensation delineated in this Complaint was fraudulently and deceptively concealed by Prudential.  None of Prudential's Fund Fact Sheets or other documents adequately disclose the nature of the RSPs it receives.

122.    Even assuming *arguendo* that Prudential contends that it somehow adequately disclosed the existence and nature of these revenue sharing payments, regardless of how it obscured such disclosure (or purports to assert that any of the Plans consented to its conduct), Prudential's receipt of revenue sharing payments for its own account is *per se* unlawful and cannot be excused by alleging that there was any purported disclosure or consent.  Similarly, Prudential's receipt of compensation on its own account, by leveraging the assets contained in the Separate Accounts and the Trusts, which amounts to self-dealing and the self-payment to Prudential of unreasonable compensation through the investment and use of the Plans' retirement assets, violates applicable law (specifically, ERISA).

**G.    Prudential Also Improperly Earns Income On The Assets Of The Trusts And Separate Accounts Through Its Conflicted Arrangements And Self-Dealing**

123.    Prudential also has utilized investments in the Separate Accounts and the Trusts through leveraging and securities lending schemes to earn additional, excessive compensation through the use of the Plans' retirement assets for its own profit and gain.

124.    Prudential also has earned excessive and unlawful compensation in the form of sub-advisory and other fees with respect to purported, proprietary and other mutual funds.

## V.    CLASS ACTION ALLEGATIONS

125.    This action is brought as a class action by Plaintiff individually and in a

representative capacity on behalf of the Plan and the Plans, as well as the following proposed

class ("Class") and sub-class ("Sub-Class"):

> **Class**
>
> All employee pension benefit plans covered by the Employee
> Retirement Income Security Act of 1974 subject to Internal
> Revenue Code §§ 401(a) or 401(k) with which Prudential has
> maintained a contractual relationship based on a group annuity
> contract, group funding agreement and/or trust agreement.
>
> **Sub-Class**
>
> All participants and beneficiaries of the Ferguson Plan.

Excluded from the Class and Sub-Class are Defendants, any employee pension benefit plans for

which Prudential's directors, officers or employees are beneficiaries and any employee pension

benefit plans for which the Judge to whom this case is assigned or any other judicial officer

having responsibility for this case is a beneficiary.  The claims in this action are asserted with

respect to the period six years preceding the initiation of this proceeding and continuing

thereafter.

126.    This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

127.    **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of

Class and Sub-Class members throughout the United States.  As a result, the members of the

Class and Sub-Class are so numerous that their individual joinder in this action is impracticable.

128.   **Commonality**.  There are numerous questions of fact and/or law that are common to the Plan and all the members of the Class and Sub-Class, including, but not limited to the following:

(a)      whether Defendants have acted and continue to act as fiduciaries under ERISA in connection with the conduct described herein;

(b)      whether Prudential has engaged in prohibited transactions by receiving the revenue sharing payments for their own benefit, or otherwise earned excessive compensation and effectively charging excessive fees for the administrative, management and investment services it provides to the Plans;

(c)      whether Defendants have breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans, by charging the Plans excessive fees and/or by failing to ensure that the fees and expenses of the Plan were fair and reasonable;

(d)      whether Prudential has failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees and compensation received by Prudential and/or charged to the Plan and its participants; and

(e)      whether and what form of relief should be afforded to Plaintiff, the Class and the Sub-Class.

129.   **Typicality**.  Plaintiff, who is a representative of the Plan and the Plans, has claims that are typical of all of the members of the Class and the Sub-Class.  Plaintiff's claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that

are applicable as to all other members, respectively, of the Class and Sub-Class.

130. **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class and Sub-Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class and Sub-Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

131. **Predominance**.  Common questions of law and fact predominate over questions affecting only individual members of the Class and Sub-Class, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each member of the Class and Sub-Class, the calculation of which will ultimately be a ministerial function and which does not bar certification.

132. **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the members of the Class and Sub-Class are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of the Class and Sub-Class members would be too small to economically justify individual litigation given the complexity of the issues in this case.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

133.   **Manageability**.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to Class members and Sub-Class members would be essentially a ministerial function.

134.   Defendants have acted on grounds generally applicable to the Class and Sub-Class, respectively, by uniformly subjecting Class and Sub-Class members to the revenue-sharing scheme and other conduct described above, which scheme Defendants clearly intend to continue to perpetrate in the future.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

**COUNT I**
**(Violation Of ERISA's Prohibited Transaction Rules And For Breach Of Fiduciary Duty)**

135.   Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

136.   Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and are fiduciaries based on their discretion, authority and/or control with respect to the administration, management and/or disposition of the Plans and their assets, and their provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendants' authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

137.   Prudential controls the selection of the mutual funds available as investment

options for the Plans and their participants, provides investment advice for compensation with respect to these investment options, uses its custody, control, ownership and dominion over the Separate Accounts and Trusts, as well as the accumulated units of assets of the Plans, and uses its discretionary authority and responsibility in the administration of the Plans to obtain revenue sharing payments from the mutual funds and to earn other compensation from self-dealing as described above.

138.    The revenue sharing payments made by the mutual fund companies to Prudential constitute plan assets because: (a) Prudential receives the payments as a result of its fiduciary status or function (*e.g.*, because Prudential receives payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to Prudential at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge, but also the amount of the revenue-sharing payments they have to make to Prudential); and/or (c) revenue-sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

139.    Prudential is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them, either directly or through its subsidiaries or affiliates, as well as self-determining its excessive compensation, as described above.

140.    Prudential has engaged in and continues to engage in prohibited transactions in

violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

141.    Prudential has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plans, their participants and/or beneficiaries in connection with transactions involving the Plans.

142.    Prudential's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by Prudential amounts to and constitutes a fiduciary receiving consideration in the form of revenue sharing payments for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the separate accounts or sub-accounts, and/or represented by the accumulation units.  Specifically, the mutual funds deal with the Plans by accepting funds from Separate Accounts and Trusts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans.  Furthermore, as explained above, Prudential also has engaged in prohibited transactions with respect to its control over the investments in the Trusts and Separate Accounts and its earning of improper and excessive compensation through acts of self-dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

143.    Prudential's arranging for and retention (or the retention by its affiliates or

subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Prudential failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  Prudential's violations of ERISA § 406 also amount to *per se* violations of ERISA § 404.

144.    Prudential also breached its fiduciary duties by using its discretion and control over or influence with respect to the Trusts and Separate Accounts, as well as their accumulation units, to generate the RSPs and other improper compensation for its own benefit.  Prudential did not use the Trusts, Separate Accounts and the accumulation units for the exclusive purpose of providing benefits to the Plans' participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person.  As to the revenue sharing payments themselves, to the extent they constitute Plan assets, Prudential failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.  Finally, as set forth above, Prudential breached its fiduciary duties by earning excessive compensation on its own account.

145.    Prudential and the Ferguson Defendants, as set forth above, have engaged in and continue to engage in severe breaches of fiduciary duty with respect to the investments in the Plans and Plan, respectively, in violation of ERISA § 404, 29 U.S.C. § 1104 by failing to (a) discharge their duties with respect to the Plans and Plan, respectively, solely in the interest of the Plans, participants and beneficiaries, as applicable, for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the Plans, including the Ferguson Plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (b) failing to monitor the expenses of the Plans and Plan, respectively, as well as the performance of other fiduciaries to the Plan or Plans (as applicable) in a prudent and reasonable manner.

146.    As a direct result of Defendants' breaches of duties, Plaintiff, as well as the Class and Sub-Class, respectively, have suffered losses and damages.

147.    Pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Prudential is liable to the Plans to credit back, disgorge and/or make restitution of all revenue sharing payments and other improper compensation received by it; or, alternatively, Prudential is liable to the Plans and the Class to pay damages or make restitution to the Plans in an amount representing the difference between the revenue sharing payments and other compensation that it received, and the reasonable fair market value of any services provided to the Plans by Prudential, while Prudential and the Ferguson Defendants are liable to the Class and Sub-Class,

respectively, for all losses and related damages suffered by the Plans and the Ferguson Plan, respectively, caused by their breaches of fiduciary duty.

148.    Plaintiff, the Class and Sub-Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

149.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiff, the Class and Sub-Class, respectively, seek an Order declaring that the above-described practices violate ERISA, as set forth above, and seek a permanent injunction preventing Defendants from engaging in such conduct in the future.

## COUNT II

### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

150.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

151.    In the alternative, to the extent that Prudential or any of the Ferguson Defendants are not deemed fiduciaries or co-fiduciaries under ERISA, any such Defendant is liable to the Class and Sub-Class, respectively, for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, on behalf of himself, the Class and Sub-Class, demands judgment against Defendants, Prudential Retirement Insurance and Annuity Company, Prudential Bank & Trust, FSB, CapFinancial Partners, LLC d/b/a CapTrust Financial Advisors and Ferguson Enterprises, Inc. for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a)

as detailed above;

(b)      Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a);

(c)      Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)      Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)      Such further and additional relief to which Plaintiff, the Class and/or the Sub-Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

<u>**NOTICE PURSUANT TO ERISA § 502(h)**</u>

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the

undersigned hereby affirms that, on this date, a true and correct copy of this Amended Complaint

was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

receipt requested.

Dated: April 6, 2016                         Respectfully submitted,


                                             /s/  Laurie Rubinow
                                             James E. Miller (ct21560)
                                             Laurie Rubinow (ct 27243)
                                             Shepherd Finkelman Miller
                                               & Shah, LLP
                                             65 Main Street
                                             Chester, CT 06412
                                             Telephone: (860) 526-1100
                                             Facsimile:  (866) 300-7367
                                             Email: jmiller@sfmslaw.com
                                                     lrubinow@sfmslaw.com

                                             Ronald S. Kravitz
                                             Kolin C. Tang
                                             Shepherd Finkelman Miller
                                               & Shah, LLP
                                             One California Street, Suite 900
                                             San Francisco, CA 94111
                                             Telephone: (415) 429-5272
                                             Facsimile:  (866) 300-7367
                                             Email: rkravitz@sfmslaw.com
                                                     ktang@sfmslaw.com

                                             Nathan Zipperian
                                             Shepherd Finkelman Miller
                                               & Shah, LLP
                                             1640 Town Center Circle, Suite 216
                                             Weston, FL 33326
                                             Telephone: (954) 515-0123
                                             Facsimile:  (866) 300-7367
                                             Email: nzipperian@sfmslaw.com

-44-

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile:  (818) 609-0892
Email: sahagii@aol.com

***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

   I hereby certify that on April 6, 2016, a copy of the foregoing Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Plaintiff also will serve all additional defendants upon issuance of a summons for each such party.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

         /s/  Laurie Rubinow
         Laurie Rubinow (ct 27243)
         Shepherd Finkelman Miller
          & Shah, LLP
         65 Main Street
         Chester, CT 06412
         Telephone: (860) 526-1100
         Facsimile:  (866) 300-7367
         Email: lrubinow@sfmslaw.com